IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| JOANN C. SCHAUDT, | ) | Case No. 09 B 26821 |
| | ) | |
|       Debtor. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 09 A 01322 |
| | ) | |
| JOANN C. SCHAUDT, | ) | |
| | ) | |
|     Defendant. | ) | Hon. Susan Pierson Sonderby |

## MEMORANDUM OPINION

This matter comes to be heard on the five-count amended complaint of the United States of America for a determination of nondischargeability of a particular debt owing to it by the debtor Joann C. Schaudt (the "Debtor") pursuant to sections 523(a)(2)(A) or 523(a)(6) of title 11 of the United States Code (the "Bankruptcy Code") (Counts I and II) or to deny the Debtor a discharge pursuant to sections 727(a)(2)(A), (a)(4) and (a)(5) of the Bankruptcy Code (Counts III, V and IV, respectively). A trial was held and the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1), made applicable herein by Fed. R. Bankr. P. 7052.

For the reasons stated, the court will enter judgment in favor of the Debtor denying the objections to discharge asserted in Counts III, IV, and V, and in favor of the United States on Count I, determining the debt nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code. Having determined that the debt is nondischargeable under section 523(a)(2)(A), Count II is moot and need not be addressed. *See* In re Bath, 442 B.R. 377, 399 (Bankr. E.D. Pa. 2010); In re

Draiman, 2006 WL 1876983, * 9 (Bankr. N.D. Ill. Jun. 22, 2006); In re Brier, 274 B.R. 37, 46

(Bankr. D. Mass. 2002); In re Tadisch, 220 B.R. 371, 376 (Bankr. E.D. Wis. 1998).

## I.   **FINDINGS OF FACT**

**Events Prior to the Petition Date**

 The Debtor and Robert Schaudt ("Robert") were married in June of 1973 and have three

children, all of whom are now adults.  Robert is a software engineer.  He developed an inventory

tracking software program used by automobile dealerships.  He set up a sole proprietorship to

operate a business marketing and servicing the program.

 In the mid-1990's the Internal Revenue Service ("IRS") filed liens against Robert and the

Debtor for the back taxes owned by the sole proprietorship. In March of 1997, Robert formed Zeus

Concepts, LLC ("Zeus Concepts") to take over operation of the software business and, according to

Robert, to prevent the United States from recovering on the tax liens. A trust known as the Zeus

Trust owned 98% of the shares in Zeus Concepts.  The Debtor owned the remaining two percent.

The three Schaudt children are the sole beneficiaries of the Zeus Trust.

 Around that time, Robert and his brother were co-trustees of the William G. and Evelyn M.

Schaudt [Robert's parents] Family Trust (the "Schaudt Family Trust") which held title to a house

in Northbrook, Illinois (the "Northbrook House"), where Robert, the Debtor and their children lived.

Robert's parents were the life beneficiaries.  In May of 1996, both of Robert's parents passed away.[1]

---

The United States alleges in the Amended Complaint that the Schaudt Family Trust states that "upon the
death of us [William G. and Evelyn M. Schaudt], the trust property shall be distributed as follows: 1. the
Northbrook Property . . . shall be distributed to our son Robert F. Schaudt." (Amended Complaint, ¶ 21)
The Debtor responded to that allegation by stating that the Schaudt Family Trust speaks for itself.

During that general time period, beginning in 1995, Robert and the Debtor separated. They

reunited in 2002, but about three years later, after more than thirty years of marriage, the Debtor filed

a petition for dissolution of the marriage in the Circuit Court of Cook County on November 15,

2005. The Debtor was represented by counsel in the divorce case. Robert represented himself *pro*

*se*. On December 5, 2005, about three weeks after the petition for dissolution was filed, the judge

presiding over the divorce case entered an uncontested dissolution judgment which incorporated a

marital settlement agreement. The Settlement of Property Rights article of the marital settlement

agreement states, in part:

> The marital residence of the parties located [in Northbrook, Illinois] has been titled
> in trust and ROBERT and his brother are co-trustee's, although ROBERT has
> represented to JOANN that his brother has conveyed all right title and interest in the
> trust to Robert. Therefore, Robert agrees to record the quit claim deed provided to
> him by his brother and provide a fully executed quit claim (*sic*) conveying all right
> title and interest in the marital residence to JOANN.

(Plaintiff's Ex. 11, p. 8 Article 4.3)

The marital settlement agreement also requires Robert to pay the Debtor $8,000 per month

indefinitely, even if the Debtor were to remarry. It further provides that Robert is responsible for any

pre-divorce tax liabilities.

On December 20, 2005, about two weeks after entry of the dissolution judgment, Robert

quitclaimed the Northbrook House to the Debtor, "individually and as co-trustee of the Schaudt

Family Trust." The house was then valued at no less than $539,000. In exchange for that transfer,

the Debtor gave up the purported 2% interest she had in Zeus Concepts then valued at $84,000.

Four months later, in April 2006, the Debtor obtained a $377,300 loan from Countrywide

Bank n/k/a Bank of America (the "Countrywide Loan Proceeds"), which was secured by a mortgage

on the Northbrook House. To obtain that loan, she completed a Uniform Residential Loan Application (the "Loan Application"), wherein she stated that she had owned the Northbrook House for 26 years, had $13,000/month employment income, was a vice president of Zeus Concepts, and had been working at Zeus Concepts for the past 26 years. All of those statements were false. Those incorrect statements were repeated by the Debtor in a second loan application dated May 22, 2006, executed by her to receive a purchase money loan.

The Debtor used approximately $170,000 of the net Countrywide Loan Proceeds to put a down payment on the purchase of a house in Antioch (the "Antioch House"). The remaining $172,000 of the Countrywide Loan Proceeds were deposited not into an existing bank account, but into an account opened up on May 4, 2006, at Harris Bank under the Debtor's name as trustee for her daughter as beneficiary (the "Harris Account"). The Debtor has explained that much of the proceeds in the Harris Account were spent over the next one and one-half years on the upkeep of the Northbrook House and the Antioch House.

From the Debtor's perspective, the story thus far describes the disintegration of a marriage after a relatively brief attempt at reconciliation, and a transfer of the family residence from one spouse to another. The United States tells an entirely different story, however. At the time of the transfer of the Northbrook House, Robert was still heavily indebted to the United States. Indeed, by February 2000, Robert owed in excess of $530,000 for various federal taxes and the associated penalties and interest incurred in connection with the operation of Zeus Concepts. The United States viewed the divorce as a fraudulent sham designed not just by Robert but by the couple to shield the Northbrook House from its efforts to collect the tax debt owing by Robert.

Indeed, the United States points out, among other indicators of the sham, that the Debtor filed

4

the divorce case about a month after she and Robert met with tax counsel. At that time, tax counsel was communicating with an Internal Revenue Service agent about the ownership of the Northbrook House. The tax counsel provided a title report to the IRS agent indicating that title to the Northbrook House was held in the Schaudt Family Trust's name, not Robert's. To the United States, the fact that the quick divorce was accomplished on the heels of an IRS collection agent inquiring into the ownership of the Northbrook House is an indicator that the couple wanted whatever interest Robert had in the house transferred to the Debtor out of the reach of the United States.[2] Moreover, after the divorce and the transfer, Robert remained with the Debtor in the Northbrook House until May or June of 2006, when he moved without her to the Antioch House. The Debtor joined him at the Antioch House in November of 2006.

On February 15, 2007, the United States filed a complaint against Robert, the Debtor, Countrywide Bank, and others in the United States District Court for the Northern District of Illinois commencing case no. 07CV895 (the "District Court Case"). The United States sought: (a) the entry of judgment against Robert in the amount of the tax debt, (b) to foreclose on the tax liens against the Northbrook House and the Antioch House, (c) to set aside the fraudulent conveyance of the Northbrook House, (d) the entry of a money judgment against the Debtor equal to the value of the Northbrook House, and (e) the imposition of a constructive trust based on an unjust enrichment

---

[2]

The United States argues that after Robert's parents died, he became both the trustee and beneficiary of the Schaudt Family Trust. The legal and equitable title thus merged in Robert, making him the true owner of the Northbrook House, even though the title was not corrected. It seems unnecessary to sort that issue out, given that whatever interest Robert had in the Northbrook House was quitclaimed to the Debtor in accordance with the marital settlement agreement.

theory on the Northbrook House and Antioch House.[3] The United States and Countrywide Bank

entered into a Stipulation filed in the District Court Case agreeing that Countrywide Bank's

mortgage has priority over all of the federal tax liens claimed by the United States. They also agreed

that the United States' claim for imposition of a constructive trust on the Northbrook House is

subject to the Countrywide Bank mortgage.

The District Court Case was assigned to Magistrate Judge Arlander Keys. He issued a

Memorandum Opinion and Order on October 8, 2008, denying summary judgment on the United

States's claim that the transfer was actually fraudulent or constructively fraudulent, finding that there

were unresolved factual disputes as to both theories. He granted summary judgment, however, on

the United States' claim that the Debtor took title to the Northbrook House subject to the taxes

assessed against Robert prior to the transfer, but not those assessed post-transfer. He also noted that

it was unnecessary to resolve the issue of what Robert's exact interest in the Northbrook House was

prior to the transfer to the Debtor. He had at least "a property interest which the government could

levy upon." (Plaintiff's Ex. 16, p. 17). He concluded that, if the transfer was later decided to be

fraudulent, the United States could recoup the pre-transfer taxes through foreclosure proceedings.

On January 21, 2009, Judge Keys issued a Memorandum Opinion and Order granting the

United States' motion to reconsider his denial of summary judgment as to the fraudulent transfer

---

[3]

To the extent the facts concerning the events in the District Court Case or Bankruptcy Case are not in evidence, the court will take judicial notice of the dockets of and filings in the Bankruptcy Case and District court case. See Independent Trust Corp. v. Stewart Information Services Corp., 665 F.3d 930, 942 (7th Cir. 2012)(judicial notice properly taken "of the indisputable facts that those documents exist, they say what they say, and they have had legal consequences."); In re Woodmar Realty Co., 294 F.2d 785, 788 (7th Cir. 1961)(stating that a bankruptcy court is duty bound to take judicial notice of its records and files); Opoka v. I.N.S., 94 F.3d 392, 394-95 (7th Cir. 1996)(noting that it is proper to take judicial notice of the fact that another court made a decision relating to the matters at issue).

claim. He declined to alter his decision denying summary judgment as to the actually fraudulent transfer claim. He did, however, elect to alter his decision as to constructive fraud, and concluded as a matter of law that the transfer of the Northbrook House was constructively fraudulent and the appropriate remedy was the imposition of a constructive trust. Judge Keys in the Memorandum Opinion, "having determined that fraud is not a requisite, impose[d] a constructive trust on the Antioch property to the extent the equity in the Northbrook House is not sufficient to satisfy Robert's tax debts."

The Debtor's subsequent motion to reconsider was denied, and the United States moved for entry of final judgment. During the briefing schedule on that motion, on July 24, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code (the "Bankruptcy Case"). On October 1, 2009, Judge Keys entered judgment in the amount of $585,267.04, plus interest against Robert, but took no further action against the Debtor given the pendency of the automatic stay.

This court later entered an order modifying the stay to allow the United States to go forward with seeking entry of final judgment. Given that Judge Keys had already decreed the imposition of a constructive trust on the Antioch House in favor of the United States prior to the filing of the Bankruptcy Case, *see* Belisle v. Plunkett, 877 F.2d 512, 513 (7th Cir. 1989), the Debtor's conceded lack of interest in the Antioch House, and the chapter 7 trustee's lack of opposition, the court found cause to modify the stay. On February 8, 2010, Judge Keys entered a final judgment against the Debtor which included a finding that the United States's tax liens had attached to the Northbrook House and the Antioch House, under a constructive trust for the benefit of the United States, which are inferior to the mortgages.

In the year preceding the Petition Date, the Debtor and her adult son, Robert John Schaudt ("Robert John") placed a number of charges totaling $3,598 on the Debtor's American Express credit card to pay for airline tickets, a hotel room, food, and gas (the "AMEX Charges"). On the Petition Date, the Debtor withdrew $1,500 cash from her bank account (the "Cash Payments"), to pay her bankruptcy counsel, divorce counsel, and for groceries.

**Events After the Petition Date**

After the Petition Date, the Debtor was examined under oath at a meeting of creditors held pursuant to section 341(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2003 (the "341 Meeting") and testified under oath at a later examination pursuant to Fed. R. Bank. P. 2004 (the "2004 Exam"). She testified at the 341 Meeting and the 2004 Examination that she had filed her federal tax returns for 2007 and 2008. Those returns in fact had not been filed at the times of that testimony.

In conjunction with the 2004 Exam, the United States issued and served on the Debtor a request for production of documents, including cancelled checks. The Debtor thereafter went through her file cabinets at her home and pulled more than 500 pages of responsive documents. She copied and delivered them to her bankruptcy counsel's office for production to the United States. Of those 500 pages of documents, 230 pages related to bank accounts, including the Harris Account. The document production did not include cancelled checks. At the time of the production, the Debtor was not receiving copies of cancelled checks with her Harris Account bank statements.

The Debtor assured the United States at the 2004 Exam that she had given her counsel all documents that were responsive to the document request. The Debtor's bankruptcy counsel inquired about the Harris Account cancelled checks. Realizing they were not in the production, the Debtor went to the bank and ordered cancelled checks. It took ten days to receive the cancelled checks and

8

upon receipt, they were immediately turned over to Debtor's bankruptcy counsel for production to the United States.

At the 2004 Exam, the Debtor testified that "she knew absolutely nothing about Robert's business." The Debtor, however, testified at trial that she periodically visited Robert at Zeus Concepts' place of business and urged her husband to be more proactive in collecting accounts receivable. Robert testified that the Debtor repeatedly "badgered" him about the way he ran the business. He referred to her as the "chairman of the board."

On December 24, 2009, the United States filed an adversary complaint, which was later amended, asking this court to determine that the Debtor's debt to it is nondischargeable, or to deny the Debtor a discharge of all her pre-Petition Date debts. The court will address the objections to entry of a discharge first because a denial of discharge renders issues about the dischargeability of a particular debt largely moot. See, e.g., In re Thomas, 431 B.R. 468, 473 (8th Cir. BAP 2010); In re Kent, 397 B.R. 438, 443 (Bankr. C.D. Ill. 2008); In re Riley, 351 B.R. 662, 670 (Bankr. E.D. Wis. 2006); In re Chilton, 2004 WL 3510108, at * 1 (M.D.N.C. Apr. 15, 2004); In re Dawdy, 1998 WL 34069398. at * 2 (Bankr. C.D. Ill. Oct. 15, 1998). Notably, proof of conduct satisfying any subsection of section 727(a) is sufficient to deny discharge. See, Matter of Krehl, 86 F.3d 737, 744 (7th Cir.1996).

## II. CONCLUSIONS OF LAW

### Jurisdiction and Venue

This court has jurisdiction over this core proceeding to determine the dischargeability of a particular debt and objecting to discharge. 28 U.S.C. § 1334(b); Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois; 28 U.S.C. § 157(b)(2)(I) and

9

(J).  Venue is proper in this court.  28 U.S.C. § 1409(a).

A.      **Objections to Discharge**

"The primary benefit of filing for bankruptcy under chapter 7 is that the financial discharge gives the debtor a 'fresh start.'"  Stamat v. Neary, 635 F.3d 974, 978 (7th Cir. 2011).  Congress has recognized, however, that not all debtors should be given the privilege of a discharge and has laid out a number of exceptions to discharge describing those debtors.  Id.

Here, the United States asserts that this court should not grant the Debtor a discharge of her debts because she is a debtor who has committed the acts described in three of those exceptions found at sections 727(a)(2), (a)(4), and (a)(5).  Discharge exceptions are construed strictly against the creditor and liberally in favor of the debtor.  In re Kontrick, 295 F.3d 724, 736 (7th Cir. 2002).  The plaintiff bears the burden to show by a preponderance of the evidence that the debtor is not entitled to a discharge.  Fed. R. Bankr. P. 4005; In re Scott, 172 F.3d 959, 966-67 (7th Cir. 1999).

**§ 727(a)(2)(A) - transfer of property prior to the petition date**
**with the intent to hinder or defraud a creditor (Count III)**

Pursuant to section 727(a)(2)(A), the court is not to grant a discharge if it is shown that "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred . . . or has permitted to be transferred . . . property of the debtor, within one year before the date of the filing of the petition."  11 U.S.C. § 727(a)(2)(A).  The proponent of a denial of discharge under this subsection of section 727(a) bears the burden to show two things, "an act (*i.e.*, a transfer or a concealment of property) and an improper [fraudulent] intent (*i.e.*, a subjective intent to hinder, delay, or defraud a creditor).'"  Kontrick, 295 F.3d at 736 (*quoting* Rosen v. Bezner, 996 F.2d 1527, 1531 (3d. Cir. 1993)).

There must be showing of fraudulent intent on the part of the debtor.  *See* Matter of Snyder,

152 F.3d 596, 601 (7th Cir. 1998). Fraudulent intent can be shown by circumstantial evidence

because although not entirely unheard of, *see, e.g.*, Kontrick, 295 F.3d at 736-37, there are rarely

free admissions of fraudulent intent. Whether the creditor is harmed by the fraudulent transfer is

irrelevant. Village of San Jose v. McWilliams, 284 F.3d 785, 793 (7th Cir. 2002).

In the Village of San Jose, the Seventh Circuit Court of Appeals quoted the six factors which

the Fifth Circuit Court of Appeals believes should be considered when analyzing whether a debtor

had the requisite fraudulent intent for purposes of section 727(a)(2)(A):

> (1) the lack of inadequacy of consideration; (2) the family, friendship or close
> associate relationship between the parties; (3) the retention of possession, benefit or
> use of the property in question; (4) the financial condition of the party sought to be
> charged both before and after the transaction in question; (5) the existence or
> cumulative effect of the pattern or series of transaction or course of conduct after the
> incurring of debt, onset of financial difficulties, or pendency of threat of suits by
> creditors; and (6) the general chronology of the events and transactions under inquiry.

Id. at 791 (*quoting* Pavy v. Chastant (In the Matter of Chastant), 873 F.2d 89, 91 (5th Cir. 1989)).

The Fifth Circuit held that if one or more of the six factors are shown, a presumption of fraudulent

intent is established and the burden shifts to the debtor to demonstrate lack of fraudulent intent. Id.

In the end, the court's overall task in examining the debtor's intent in making the transfer is

to consider the debtor's "whole pattern of conduct." In re Ratner, 132 B.R. 728, 731 (N.D. Ill. 1991).

In Ratner, the District Court affirmed Bankruptcy Judge Barliant's decision to credit the debtor's

alternative explanation for the alleged fraudulent transfers of funds from a bank account. He

concluded that the transfers of funds were not fraudulent because the funds were used to pay for

ordinary household expenses such as groceries, gas, and food. Id. at 733.

Ordinary household expenses are typically not of great value and it is proper for "[a]

bankruptcy court [to] consider the value of the transferred property in evaluating whether the transfer

11

was made with fraudulent intent." In re DeLong, 323 B.R. 239, 248 (W.D. Wis. 2005). Indeed, a small value "tends to negate fraudulent intent." In re Dennis, 330 F.3d 696, 702 n. 3 (5th Cir. 2003)(citing 6 COLLIER ON BANKRUPTCY ¶ 721.02[3][b], at 727-19-20 (L. King ed., 15th ed. 2003)).

Here, the United States has shown that the Cash Payments and the AMEX Charges were made by the Debtor within the year preceding the Petition Date. The Cash Payments clearly constitute transfers within the meaning of section 101(54) of the Bankruptcy Code. The United States has not explained exactly how the AMEX Charges are "transfers of the Debtor's property," as opposed to incurrence of debt. In any event, the court will assume they qualify as transfers because as with the Cash Payments, the United States has not shown that the AMEX Charges were made by the Debtor with the intent to hinder, delay, or defraud a creditor.

First, there is no direct evidence of fraudulent intent in the record. Moreover, there is insufficient circumstantial evidence to conclude that the Debtor had the fraudulent intent. The Debtor credibly explained that the Cash Payments made on the Petition Date were used to pay her bankruptcy counsel ($1,000), divorce case expenses ($200), and for family spending cash, to use on such items as groceries ($300).

The Debtor's testimony and her son Robert John's testimony concerning the circumstances of the AMEX Charges was also credible and tended to show the non-fraudulent nature of the transfers. For example, the $1,046 airline tickets charged by the Debtor for a trip to Las Vegas may have raised a slight alarm, but the Debtor explained that the tickets were purchased for her and her mother to travel to Las Vegas to make funeral arrangements for her mother's sister. Robert John charged a $150 airline ticket from Bangkok to Hong Kong and a $136 hotel room in Hong Kong on

12

his mother's credit card.    Again, a slight alarm, but Robert John explained that while traveling

through Asia, he lost his wallet and used his mother's credit card for the needed emergency funds.

Finally, over a three-month period from April to July 2009, Robert John put charges on his

mother's card totaling less than $430 to pay for fast food, gas, and items at a guitar store.  The use

of the funds hardly show a spending spree by the Debtor designed to purposely hinder, delay, or

defraud a creditor.

In sum, the circumstances indicate that the AMEX Charges and Cash Payments were of

relatively small value and made either to pay for ordinary household expenses or other legitimate

reasons not attributable to a fraudulent intent on the part of the Debtor.

The court concludes that it has not been shown by a preponderance of the evidence that the

Debtor transferred or permitted to be transferred her property within one year of the Petition Date

with the intent to hinder, delay, or defraud a creditor, or otherwise committed an act described in

section 727(a)(2)(A).

### § 727(a)(5) - failure to explain satisfactorily any loss or deficiency of assets (Count IV)

The United States urges denial of discharge under section 727(a)(5), which provides that the

court shall grant the debtor a discharge, unless -

> the debtor has failed to explain satisfactorily, before determination of
> denial of discharge under this paragraph, any loss of assets or
> deficiency of assets to meet the debtor's liabilities.

11 U.S.C. § 727(a)(5). Under this section, a bankruptcy court has "broad power to decline to grant

a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of

assets."  In re Martin, 698 F.2d 883, 889 (7th Cir. 1983).  The creditor has the initial burden "of

proving that the debtor at one time owned substantial and identifiable assets that are no longer

available for his creditors." In re Self, 325 B.R. 224, 250 (Bankr. N.D. Ill. 2005). Once the creditor

meets its burden, the burden shifts to the debtor to satisfactorily explain the loss. Id. To be

satisfactory, the explanation does not have to be comprehensive but "must consist of more than the

vague, indefinite, and uncorroborated hodgepodge of financial transactions," so as to eliminate the

need for the court to speculate about what happened to the assets. Id.

The court is not entirely convinced that documents to support an oral explanation are

necessary in every case or for every item of loss before the explanation is considered satisfactory.

See Self, 325 B.R. at 250. Corroborating documents are preferable, but their absence may not

necessitate denial of discharge for every debtor. It is clear, however, that there must be an attempt

to explain the depletion of assets with "some evidence" which, as noted, will provide an

"explanation . . . good enough to eliminate the need for the Court to speculate as to what happened

to all the assets." Matter of D'Agnese, 86 F.3d 732, 735 (7th Cir. 1996)(quoting In re Martin, 145

B.R. 933, 950 (Bankr. N.D. Ill. 1992)). If documents are necessary to dispel the need to speculate,

such as for example, when deposited funds are spent intermittently over a long period of time, they

must be presented to the court in an organized format. The debtor "may not simply place tow sacks

[i.e., burlap bags] before the bankruptcy judge and request the judge to sift through the documents

and attempt to reconstruct the flow of the debtor's assets." In re Hughes, 873 F.2d 262, 264 (11th

Cir. 1989).

When reviewing the explanation, the court is not to concern itself with the wisdom of how

the debtor disposed of the assets. D'Agnese, 86 F.3d at 735. Accordingly, where the assets at issue

consist of funds in a bank account, the court is not going to second-guess the soundness of spending

the money on one expense over another. The court is likewise not concerned, at least for purposes

14

of section 727(a)(5), how the property was initially obtained by the debtor. Rather, the focus of section 727(a)(5) is on the sufficiency of the explanation of why that property is unavailable for distribution to creditors when the bankruptcy petition is filed.

Section 727(a)(5) is not time-specific. Indeed, "[t]he exact time a court should look back depends on the case; there is no hard and fast rule." Self, 325 B.R. at 250(citing Olbur, 314 B.R. at 741). Granted, a court's review of lost assets is commonly focused on the two-year period prior to the petition date, but "[i]nquiries beyond the two-year period may be warranted." Id. (citing D'Agnese, 86 F.3d at 734).

Importantly, because there is no fraudulent intent component, a debtor who has violated section 727(a)(5) can nonetheless receive a discharge. In re Suttles, 819 F.2d 764, 766 n. 2 (7th Cir. 1987). In Suttles, the court found that the debtor's failure to keep satisfactory records was an honest mistake and she did not intend to violate the Bankruptcy Code. Id. at 766.

Here, the United States has shown that in April 2006 the Debtor had $170,000 in net loan proceeds from the refinance of the Northbrook House that were no longer available for creditors at the Petition Date about three and a half years later. The United States satisfied its burden under section 727(a)(5).

Consequently, the burden shifted to the Debtor to satisfactorily explain why those funds are no longer available to meet her liabilities at the Petition Date. She explained that because Robert was not making alimony payments at that time, the monies were used in most part to pay for typical household expenses and the maintenance of the Northbrook Property and Antioch Property. To corroborate that explanation, she provided a chart in the Pretrial Statement setting out in columns the dates, amounts, and payees of checks drawn from the Harris Account to pay for such listed

15

expenses as landscaping, septic systems maintenance, and plumbing at the Antioch House and Northbrook House. The chart of payments was supported with copies of receipts for those items produced and explained at trial.

The United States asserts that the explanation is unsatisfactory because the Debtor only came up with receipts for expenditures that total $149,000, and some of those receipts postdate the depletion of the loan proceeds. In other words, the United States complaint is not so much about the vagueness or indefiniteness of the explanation, but the lack of exhaustive documentary cooboration for each time the Debtor spent the proceeds. As noted, however, although important, exacting documentary support is not the focus of the analysis. The focus is on eliminating speculation. Here, the Debtor's testimony, chart and receipts adequately convince the court that the monies were used to pay for expenses at the Antioch House and Northbrook House.

The court concludes that it has not been shown that the Debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

## § 727(a)(4) - knowingly and fraudulently making a false oath or account (Count V)

Finally, the United States contends that discharge should be denied under section 727(a)(4), which provides, in pertinent part, that the court shall grant the debtor a discharge unless -

> the debtor knowingly and fraudulently, in or in connection with the case -
>
> (A) made a false oath or account.

11 U.S.C. § 727(a)(4). To prevail on a section 727(a)(4) claim, the plaintiff "must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement

16

was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." Stamat, 635 F.3d at 978. "[S]tatements made at a 341 meeting, testimony given at a Federal Rule of Bankruptcy Procedure 2004 examination, and answers to interrogatories, all constitute statements under oath for purposes of § 727(a)(4)." In re Butler, 377 B.R. 895, 922 (Bankr. D. Utah 2006)(*citations omitted*).

"Intent to defraud involves a material representation that you know to be false, or, that amounts to the same thing, an omission that you know will create an erroneous impression." In re Chavin, 150 F.3d 726, 728 (7th Cir. 1998). "[A] showing of reckless disregard for the truth is sufficient to prove fraudulent intent." Stamat, 635 F.3d at 978. "To find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud." Matter of Yonikus, 974 F.2d 901, 905 (7th Cir. 1992). Fraudulent intent may be "based on inferences drawn from a course of conduct." Id. Moreover, a series of false statements, when considered together, may evidence reckless disregard for the truth. *See* Stamat, 635 F.3d at 981. To avoid debtors playing fast and loose with their disclosure obligations in bankruptcy, subsequent attempts, via amendments or otherwise to correct the falsity do not rehabilitate the initial fraudulent intent. Id. at 982.

A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Id. In other words, materiality bears on the administration of the bankrupt's estate. If the falsity concerns omitted assets, the value of the assets or the harm on administration occasioned by the omission, while relevant, is not determinative. Id.

The United States has established that the Debtor made a number of false statements under

oath at her 341 Meeting and 2004 Examination.   First, she testified that she knew "absolutely

nothing" about her husband's business.   That statement is belied by, among other testimony, her

acknowledged admonishments to Robert to step up Zeus Concepts' receivable collections.   Her

disclaimer of *any* knowledge of Zeus Concepts' business is likely rhetorical hyperbole, but it was

technically false.   However, inasmuch as the testimony related to Zeus Concepts' operations, which

she had no equity interest in at that time, it was not material to the administration of her Bankruptcy

Case.   As such, that sworn testimony does not come within the scope of section 727(a)(4).

On the other hand, her testimony concerning her tax returns and the completeness of her

discovery response was material to the Bankruptcy Case.   She testified at the 341 Meeting that she

had filed her 2007 and 2008 federal income tax returns, when in fact they were not filed at that time.

She repeated that false testimony at her subsequent 2004 Examination.   Finally, she testified at the

341 Meeting that she had produced cancelled checks in response to a discovery request, when they

were in reality produced later.

Having found the falsity and materiality of the sworn statements, the crucial question is

whether the Debtor made them with fraudulent intent.   Here, the circumstances do not indicate that

the Debtor knowingly intended to defraud, or engaged in such reckless behavior so as to justify a

finding of fraud.   She attributes the falsity of her testimony about filing the tax returns on her

mistaken belief that her accountant had filed them.   She explains that she visited her accountant's

office twice.   First, to give him information to prepare the returns, and then to pick them up once

they were completed.   At her second visit, she was given an envelope by the accountant's staff that

contained the returns and a cover letter explaining how to file them.   She did not see the instructions,

however, because she promptly put the unopened envelope in her file cabinet at home, thinking the

18

accountant's staff had given her copies of the returns that were actually filed by them. That action

was a careless act based on a mistaken belief. That mistaken belief informed her testimony at the

341 Meeting and 2004 Examination, not any intent to deceive anyone about the actual filing of the

returns. Indeed, once she discovered the truth of the filing, she promptly filed the returns (which

indicated no liability).

The circumstances also indicate that the testimony about the completeness of the discovery

response was also attributable to a mistake, not fraudulent intent. She was not receiving cancelled

checks along with her statements for the Harris Account. That fact, not a fraudulent intent, is why

they were omitted from the more than 500 pages of documents delivered to her counsel to produce

to the United States.

The court concludes that it has not been shown that the Debtor knowingly and fraudulently

made a false oath or account.

## B.   Non-Dischargeability of the Debtor's Judgment Debt

Having concluded that there is no proven reason to deny the Debtor a discharge, the next

issue raised by the Amended Complaint is whether a particular debt should be excepted from the

discharge under section 523(a)(2)(A) or (a)(6) of the Code.

### 523(a)(2)(A) - dischargeability of debt for actual fraud (Count I)

Section 523(a)(2)(A) provides that "a discharge under section 727 . . . does not discharge an

individual debtor from any debt — (2) for money, . . . to the extent obtained by — (A) false

pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an

insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The Seventh Circuit Court of Appeals has

noted that the most common type of debt arising from fraud that comes within the scope of section

523(a)(2)(A) is a debt caused by representational fraud, which is a deliberate misrepresentation or a deliberately misleading omission designed to convince someone to give you money, services, or credit. McClellan v. Cantrell, 217 F.3d 890, 892 (7th Cir. 2000). Section 523(a)(2)(A) is not limited to debts arising from representational fraud, however. Id. at 893. The section also encompasses debts arising from "actual fraud" which does not involve a representation but involves a debt incurred by "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." Id. (quoting 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][e], p. 523-45 (15th ed., Lawrence P. King ed., 2000)). In this matter, the United States contends that its debt arises from the Debtor's actual fraud.

For example, an actual fraud within the scope of section 523(a)(2)(A) is committed by a bankrupt debtor when she is a willing and knowing recipient of a fraudulent transfer of property orchestrated by the debtor and the non-debtor transferor to thwart one of the transferor's creditors. Id. In McClellan, it was alleged that the bankrupt and her brother contrived a transfer of his machinery to her to shield it from the brother's creditor. She was alleged to be a "full and equal participant in her brother's fraud." Id. at 894. That shared fraud was thus imputed to her and created a debt that she owed to the brother's creditor, separate from his contractual debt to the creditor. In other words, her debt arose "by operation of law from her fraud." Id. at 895 (emphasis in original). Conversely, a debt does not arise by operation of law, where the recipient of the transfer is innocent of the fraud, i.e., there is no shared intention to hinder the creditor's efforts to collect its debt. Id. In that circumstance, an imputed debt does not arise.

McClellan was decided in the context of a motion to dismiss a complaint. Consequently, the Court was deciding whether the plaintiff sufficiently plead a claim, not whether it was shown in

20

the lower court that the plaintiff proved the claim. Accordingly, the Court did not describe with detail what factors a court should examine to determine whether actual fraud was shown in that context.

One post-McClellan court concluded after trial that the debt owing by the debtor/fraudulent transfer recipient was not excepted from discharge based on the "totality of the evidence presented." In re Barber, 281 B.R. 617, 624 (Bankr. W.D. Pa. 2002). That evidence was largely circumstantial; e.g., the debtor was an "insider" of the transferor, and the transfer was kept secret. The evidence was the type of actual fraud indicators examined by courts in other contexts commonly known as "badges of fraud." *See, e.g.,* 740 ILCS 160/5(b); U.S. v. Engh, 330 F.3d 954, 956 (7th Cir. 2003).

While fraud may be inferred from a sufficient number of badges, In re Zeigler, 320 B.R. 362, 373 (Bankr. N.D. Ill. 2005), it is important to recognize that the badges are neither exhaustive nor additive. Brandon v. Anesthesia & Pain Management Associates, Ltd., 419 F.3d 594, 600 (7th Cir. 2005). Rather, the badges are correctly viewed as "symptoms of fraud." Id.

To adequately analyze the existence of actual fraudulent intent, however, the court should address more than one of the badges. Hong Kong Electro-Chemical Works, Ltd. v. Less, 539 F.3d 795, 801 (7th Cir. 2008). Moreover, the badges should be viewed in the context of the transfer. *See* Engh, 330 F.3d at 956. For example, a transfer to a family member "doesn't always raise eyebrows, [but] eyebrows must be raised . . . when the transfer is viewed in the context of what else was going on in [the transferor's] life when the conveyance was made." Id. at 956. Gauging what else is going on in the transferor's life at the time of the transfer assists in determining the primary motivation for the transfer.

In this matter, the purported fraudulent transfer was made in furtherance of a marital

21

settlement agreement which was incorporated in a divorce decree. It could be argued that the divorce

was entered into not for a legitimate interpersonal reason usually attendant to the dissolution of a

marriage , but only so the martial settlement agreement could lend an air of legitimacy to the transfer

of the house out of the reach of the United States. Courts, including this one, have undone fraudulent

transfers when the divorce from which it originated was found to be a sham. *See* In re Chevrie,

2001 WL 120132, * 10 (Bankr. N.D. Ill. Feb. 13, 2001).

There are "badges of fraud" particularly relevant to a sham divorce. They include a number

of facts: the quickly agreed upon split of property, the completion of the divorce proceeding on a

"fast-track," the fact that one of the spouses was not represented by counsel in the divorce

proceeding, the existence of a short interval between the entry of the divorce decree and the

bankruptcy filing, the fact that spouses continue to live together after the divorce in the very house

that was transferred to one of the spouses, the fact that the transferor spouse continues to pay the

mortgage, taxes, and other costs on the transferred house, the inequitable distribution of debts and

assets in the divorce, and the fact that the couple holds themselves out in the public as still being

married. *See* Id.; In re Pilcher, 2008 WL 2682858, * 4 (Bankr. C.D. Ill. Jun. 25, 2008);  In re Hill,

342 B.R. 183, 199-200 (Bankr. D.N.J. 2006);  In re Zamudio, 2005 WL 2035969, *9-10 (Bankr.

N.D. Ill. Aug. 23, 2005);  In re Rodgers, 315 B.R. 522, 531 (Bankr. N. D. 2004): In re Boba, 280

B.R. 430, 434-35 (Bankr. N.D. Ill. 2002); In re Dunham, 2000 WL 33679421, * 4 (Bankr. D.N.H.

2000).

The court should be careful not to infer fraudulent intent based solely on a lack of acrimony

between the divorcing spouses. In this regard, one court found "nothing suspicious in the conduct

of [the] parties to a 42-year marriage in going about their divorce proceedings in a reasonably

22

amicable and unemotional manner in the circumstances." In re Riso, 74 B.R. 750, 758 (Bankr. D.

N.H. 1987). Indeed, "civility and cooperation [are] commendable rather than indicative of fraud."

Rodgers, 315 B.R. at 531.

The reverse is also true; the court should not in all circumstances infer an absence of

fraudulent intent where the couple's relationship has degenerated to acrimony.  An embittered man

and woman who are so disenchanted with each other that they cannot continue to be married may

be able to muster up just enough of a cooperative feeling to commit fraud.  See Hill, 342 B.R. at

196 (court noted that, "there are situations in which a bona fide divorce exists, but the transferor

nonetheless favors transferring assets to the ex-spouse rather than seeing them go to a creditor

body.")  In short, the interpersonal dynamic between the couple, while relevant, should not be

dispostive.

Of course, direct evidence of actual fraud is also probative of a sham divorce.  Direct

evidence is rare in this context, but there is at least one case where the court concluded that the

divorce was phony based in part on  the husband's admission that he assured his wife, who did not

want to end the marriage, that the divorce was just a "technical thing," motivated not by any

problems he had with her, but to protect their house from his creditors.  United States v. Mongelli,

857 F.Supp. 18, 20 (S.D.N.Y.  1994). Remarkably, the husband in that case promised his wife that

if she wanted to, she could remarry him in four years.  Id.

No such direct evidence exists in this matter.  The United States contends that the

circumstantial evidence shows that the transfer of the Northbrook House was motivated by the

couple's shared fraudulent intent to take it out of the reach of the United States' efforts to collect on

Robert's tax debt.

23

The Debtor contends the opposite. She primarily argues that she had no fraudulent intent because she was ignorant of Robert's tax debt when the marital settlement agreement was developed. In other words, because of her ignorance of Robert's tax debt she could not have been a willing and active participant in a fraudulent scheme to defraud the United States. She claims in this regard that she first learned of Robert's tax debt in February of 2007, years after the divorce, when she received the "huge envelope" containing a copy of the District Court Case complaint. The court finds that assertion difficult to believe.

To the contrary, the evidence shows that the Debtor first learned of Robert's tax problems when she attempted to purchase a car in the mid-1990's but was denied financing based on tax liens filed by the IRS, which, as noted earlier, had been filed in both her and Robert's names at that time. The discovery of the existence of the tax liens prompted the Debtor to hire an attorney to get "innocent spouse" recognition from the IRS in regard to Robert's tax debts. The Debtor received a letter from the IRS Office of Taxpayer Advocate dated February 24, 2000, which stated that her name was being disassociated with Robert's tax debts. That letter included three Certificates of Release of Federal Tax Lien, as against the Debtor, which listed in the aggregate $530,084 worth of tax debts. Accordingly, by as late as February 2000, the Debtor knew of Robert's half-million dollar tax debt. There is no credible evidence explaining how she purportedly lost that knowledge in the period between February 2000 and the filing of the District Court Case.

Moreover, the Debtor was meeting with Robert and a tax attorney to discuss Robert's tax debt in the months preceding the filing of the Divorce Case. Despite Robert's shaky attempts to place those meetings as occurring post-divorce, the evidence shows that they consulted tax counsel

24

in the few months leading up to the filing of the divorce, by the Debtor on November 15, 2005.[4] In August of 2005, their tax counsel was communicating with an IRS agent who was inquiring about the ownership of the Northbrook House. Tax counsel ordered and received a title report on August 5, 2005, which he sent to that agent on October 14, 2005. On November 7, 2005, the agent sent him a letter acknowledging receipt of the title report.

Eight days later the Debtor filed for divorce. The couple quickly came to terms, many of them lopsided in her favor. For example, to get the Northbrook House, which was then worth approximately $539,000, the Debtor gave up her supposed interest in Zeus Concepts, which was worth just $84,000. In addition, Robert promised to pay the Debtor $8,000 for the rest of her life, regardless of whether she remarried, and to be responsible for all pre-divorce taxes.

Moreover, after Robert's interest in the Northbrook House was transferred to the Debtor, she used the house which she then had title to in order obtain a loan to buy a new house. The Debtor obtained those mortgage proceeds on a less than true loan application. She misrepresented that she was employed by and was an officer of Zeus Concepts and that she owned the Northbrook House for the past two decades. She also stated that she had monthly income amount from employment, when she had none, and that her income was in an amount double the amount she received in alimony.[5] The loan proceeds were then placed, not into an existing account, but the Harris Account.

---

[4] Robert waffled on whether the Debtor was present at the pre-divorce meeting with tax counsel. He initially testified that he was "sure she was," then changed course and stated that the meeting was post-divorce.

[5] Clearly, this proceeding is not about excepting from discharge a debt arising from a misrepresentation made to the bank. The fact that the Debtor made the misrepresentations, should not be ignored in an analysis of the existence of whether she was a willing and active participant in the transfer.

The confluence and  the timing of these events go a long way to show that the Debtor, not just Robert, was arranging the transfer of the Northbrook House at a time when the IRS was making waves as to its ownership in order to frustrate the IRS's collection efforts.

There are additional badges of fraud present indicative of a sham divorce.  For example, after their divorce, the Debtor and Robert lived together in the Northbrook House for a period of time. Robert remained with the Debtor in the Northbrook House until May or June of 2006, when he moved without her to the Antioch House.  The Debtor joined him at the Antioch House in November of 2006 where they lived together until late 2009.

There was evidence that even though they lived together after the divorce, Robert and the Debtor's marital relationship had taken a bad turn.  The Debtor stated that although Robert was a well-meaning, good person and father, she became tired of not being a priority in his life.  She felt taken for granted.  Robert felt pestered by her.  Robert John credibly testified that his parents were living in separate areas of the Antioch House.  He testified that his father stayed in the same house with his mother after the divorce to save costs because both he and his sister were then going to college.

Although the couple may have had less than a stellar marriage, after considering all the evidence, however, the court concludes that the Debtor was an active and willing participant with Robert in the actually fraudulent transfer of the Northbrook House.  That shared fraud is imputed to the Debtor and created a debt that she owes to the United States, separate from his tax debt.

The court therefore concludes that the United States has proven by a preponderance of the evidence that the debt was obtained by actual fraud.  Accordingly, the court will enter judgment in favor of the United States on Count I of the Amended Complaint.  Count II is therefore moot and

26

need not be addressed.

## III.  <u>CONCLUSION</u>

For the reasons stated, the court will enter judgment in favor of the Debtor denying the objections to discharge asserted in Counts III, IV, and V, and in favor of the United States on Count I, determining the debt nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code. Having determined that the debt is nondischargeable under section 523(a)(2)(A), Count II is moot and need not be addressed.[6]

Date:   MAR 1 6 2012                                ENTER:

                                                    SUSAN PIERSON SONDERBY
                                                    United States Bankruptcy Judge

---

[6]

Given the result, the court will deny as moot the Debtor's motion for summary judgment with respect to Count III (docket no. 30) and her oral motion for judgment on partial findings pursuant to Fed. R. Bank. P. 7052 with respect to Counts I, II, III, IV and V.